William F. LORENZ and Karen M. Lorenz, his wife; Victor A. Czerny; John Schmidt and Janice J. Schmidt, his wife; Marjorie Slapin; Thaddeus E. Drake and Celia Drake, his wife; and Edith E. Berenkey; individually and on behalf of a class of former debentureholders similarly situated, Appellants in 92–3667,

v.

CSX CORPORATION (formerly Chessie Systems, Inc.); the Chesapeake and Ohio Railroad; the Baltimore and Ohio Railroad Company and the Chase Manhattan Bank, N.A.

Ethel B. SAVIN, individually and on behalf of a class of former debentureholders similarly situated, Appellant in 92–3694,

v.

CSX CORPORATION (formerly Chessie Systems, Inc.); the Chesapeake and Ohio Railroad; the Baltimore and Ohio Railroad Company and the Chase Manhattan Bank, N.A.

Nos. 92–3667, 92–3694.

United States Court of Appeals, Third Circuit.

Argued June 15, 1993.

Decided Aug. 6, 1993.

Michael P. Malakoff (argued), Malakoff Doyle & Finberg, P.C., Pittsburgh, PA, for appellants.

Anthony J. Basinski (argued), Reed Smith Shaw & McClay, Pittsburgh, PA, for appellees CSX Corp. (formerly Chessie Systems, Inc.), the Chesapeake and Ohio R. Co. and the Baltimore and Ohio R. Co.

Robert C. Myers (argued), Karen A. Estilo, Dewey Ballantine, New York City, H. Woodruff Turner, Kirkpatrick & Lockhart, Pittsburgh, PA, for appellee the Chase Manhattan Bank.

Before: SCIRICA, COWEN and WEIS, Circuit Judges.

## OPINION OF THE COURT

COWEN, *Circuit Judge.*

Prior to December 13, 1977, the plaintiffs in these two related actions purchased convertible debentures issued by the defendant Baltimore and Ohio Railroad Company ("B & O"). At that time, 99.63% of the B & O's shares were owned by defendant Chesapeake and Ohio Railroad Company, which in turn was a wholly-owned subsidiary of Chessie Systems, Inc., the corporate predecessor to

defendant CSX Corporation ("CSX"). The indenture trustee was defendant Chase Manhattan Bank. Plaintiffs allege that the defendants defrauded them from 1977 to 1986 by failing to disclose material information which would have enabled them to convert their debentures into B & O common stock and receive a lucrative dividend. Plaintiffs appeal the dismissal of their claims for breach of fiduciary duty, breach of the implied covenant of good faith and fair dealing, civil RICO, and violations of section 10(b) and Rule 10b–5 of the Securities Exchange Act of 1934 (" '34 Act"). We will affirm.

## I. FACTS AND PROCEDURAL HISTORY

The defendants have been involved in litigation against their debentureholders for the past fifteen years in a series of closely related actions. A detailed description of the facts and procedural history can be found in earlier district and circuit court opinions in the *Pittsburgh Terminal Corp./Guttmann* litigation. *See, e.g., Pittsburgh Terminal Corp. v. Baltimore & Ohio R.R. Co.*, 509 F.Supp. 1002 (W.D.Pa.1981), *aff'd in part, rev'd in part*, 680 F.2d 933 (3d Cir.), *cert. denied*, 459 U.S. 1056, 103 S.Ct. 475, 74 L.Ed.2d 621 (1982); *Pittsburgh Terminal Corp. v. Baltimore & Ohio R.R. Co.*, 824 F.2d 249 (3d Cir.1987) (*PTC IV*). We will recite only those facts which are relevant to these appeals.

The plaintiffs were holders of debentures [1] in the B & O Railroad as of December 13, 1977. The debentures were convertible into B & O common stock at any time before maturing in the year 2010. To avoid Interstate Commerce Commission regulations hindering the development of non-rail assets owned by railroads, B & O devised a plan to segregate its rail and non-rail assets. Non-rail assets were transferred to a wholly owned subsidiary, Mid Allegheny Corporation ("MAC"), and MAC common stock was distributed as a dividend on a share-for-share

basis to B & O shareholders. B & O sought to avoid the registration of its shares with the Securities and Exchange Commission ("SEC"), a time-consuming process which would have required appraisals of the transferred assets. Because B & O had few shareholders, the company thought that the SEC would issue a "no-action" letter excusing the registration of MAC stock. This plan would have been foiled if large numbers of B & O debentureholders exercised their conversion option in order to receive the MAC dividend.

To avoid this occurrence, B & O transferred its non-rail assets to MAC on December 13, 1977 and declared the dividend in MAC stock on the same date, without prior notice. As a result, the debentureholders could not convert their shares in time to receive the MAC dividend. Some of the debentureholders brought actions, later consolidated, under section 10(b) of the '34 Act against B & O, C & O, and Chessie Systems.[2] This suit is known as the *PTC/Guttmann* litigation. In 1978 and 1979, B & O and Chase Manhattan Bank entered into a series of letter agreements, whereby B & O agreed that if the *PTC/Guttmann* plaintiffs prevailed or obtained a settlement, debentureholders would be allowed to participate equally in that judgment or settlement regardless of whether they had converted their debentures.

The *PTC/Guttmann* plaintiffs moved for class certification. The district court denied the motion, at least in part because Chessie Systems' general counsel, Robert F. Hochwarth, filed an affidavit dated May 2, 1980 memorializing the earlier letter agreements with Chase Manhattan Bank. The affidavit, known as the "Hochwarth Stipulation," states that if plaintiffs prevail or a settlement is reached, "all holders of debentures as of December 13, 1977, whether or not they were subsequently converted, will be permitted to participate in the Court judgment or settle-

---

**1.** A "debenture" is a long-term, unsecured debt security. An "indenture" is a contract between the issuing corporation and indenture trustee pursuant to which debentures are issued. The "indenture trustee" is the person or institution named in the indenture who is responsible for

carrying out its terms. Black's Law Dictionary 401, 770 (6th ed. 1990).

**2.** Chessie Systems later merged into defendant CSX Corporation.

ment on the same terms as the plaintiffs." App. at 279.

After a bench trial, the district court entered judgment in favor of the defendants. *Pittsburgh Terminal Corp.*, 509 F.Supp. at 1017–18. We reversed. A divided panel agreed only that the failure to provide the debentureholders with advance notice of the dividend violated Rule 10b–17 of the '34 Act. *Pittsburgh Terminal Corp. v. Baltimore & Ohio R.R. Co.*, 680 F.2d 933, 941–42 (3d Cir.) (*PTC II*), *cert. denied*, 459 U.S. 1056, 103 S.Ct. 475, 74 L.Ed.2d 621 (1982); *id.* at 945–46 (Garth, J., concurring in part and concurring in the judgment). We remanded to the district court to fashion an appropriate remedy. On May 8, 1984, the district court granted plaintiffs the opportunity to convert their debentures into shares and receive the MAC dividend plus dividend income accruing since December 13, 1977. *Pittsburgh Terminal Corp. v. Baltimore & Ohio R.R. Co.*, 586 F.Supp. 1297, 1304–05 (W.D.Pa.1984), *aff'd*, 760 F.2d 257 (3d Cir.), *cert. denied*, 474 U.S. 919, 106 S.Ct. 247, 88 L.Ed.2d 256 (1985). The district court, construing the Hochwarth Stipulation, described the scope of the remedy:

> The remedy ordered here is limited to those persons who owned the subject debentures at the time of the violation, December 13, 1977, and who still own those debentures. Those persons who owned debentures on December 13, 1977 and subsequently converted to B & O common stock may also elect to participate in this remedy, obtaining MAC and its dividends, offset by interest accruing on the debentures after December 13, 1977.... Those persons who owned B & O debentures on December 13, 1977 and subsequently sold their debentures are not within the scope of ... this action....

*Id.* at 1305. The defendants were ordered to give notice to the debentureholders of the district court's order. In December of 1986, after the denial of certiorari, defendants published notice of the remedy in the *New York Times* and *Wall Street Journal.* In a subsequent appeal, we held that under the terms of the Hochwarth Stipulation, the district court's remedy also included persons who held B & O debentures on December 13, 1977, converted them to B & O common stock, and subsequently sold the stock. *PTC IV,* 824 F.2d at 256.

The plaintiffs in the present actions are those persons who are outside the scope of the *PTC/Guttmann* remedy. They held debentures on December 13, 1977 but subsequently sold them without having ever converted them into stock. On July 25, 1986, plaintiff Ethel B. Savin filed her complaint in the United States District Court for the Southern District of New York on behalf of a class of similarly situated former B & O debentureholders. The case was transferred to the Western District of Pennsylvania because of the related litigation there. On April 23, 1987, the *Lorenz* plaintiffs filed their complaint in the United States District Court for the Western District of Pennsylvania on behalf of a class of similarly situated former B & O debentureholders. The complaint alleged violations of section 10(b) and Rule 10b–5 of the '34 Act, civil RICO, and breach of fiduciary duty. The RICO claim was directed only against defendants CSX and C & O. In May of 1987, plaintiff Savin amended her complaint to contain substantially the same allegations.

In July of 1987, the defendants moved to dismiss under Fed.R.Civ.P. 12(b)(6). In August of 1987, with the consent of both parties, plaintiff Savin amended her complaint to alter a paragraph which described when she received notice of the MAC dividend. In September of 1987, the plaintiffs filed their RICO case statement. On July 14, 1989, Savin filed her motion to amend her amended complaint in order to add factual allegations to her RICO claim.

On August 27, 1990, the district court denied the motion to amend, dismissed all claims against defendant Chase Manhattan Bank, and dismissed all claims against defendants CSX, C & O, and B & O except for the section 10(b) claims. *Lorenz v. CSX Corp.,* 736 F.Supp. 650 (W.D.Pa.1990). Motions for reconsideration were filed by the plaintiffs and the defendant railroads. On August 8, 1991, the district court reinstated plaintiff Lorenz's RICO claim and dismissed plaintiff Savin's section 10(b) claim for exceeding the

applicable statute of limitations. Savin appealed. While her appeal was pending, we remanded for reconsideration in light of the recent enactment of 15 U.S.C. § 78aa–1(a). On August 18, 1992, as amended October 7, 1992, the district court dismissed Lorenz's section 10(b) and RICO claims. On November 3, 1992, the district court dismissed Savin for the reasons stated in its Lorenz opinion of August 18. Plaintiffs filed these appeals.

■ We have jurisdiction under 28 U.S.C. § 1291. We exercise plenary review over the grant of a motion to dismiss. General Elec. Co. by Levit v. Cathcart, 980 F.2d 927, 931 (3d Cir.1992). We accept all factual allegations in the complaints and all reasonable inferences to be drawn therefrom in the light most favorable to the plaintiffs. We may affirm only if it is certain that no relief could be granted under any set of facts which could be proven. Id.

## II. RICO CLAIMS AGAINST DEFENDANTS CSX AND C & O

The plaintiffs brought civil RICO claims under 18 U.S.C. § 1962(c) against defendants CSX and C & O, alleging that they conducted their subsidiary B & O's enterprise through a pattern of racketeering activity. The district court held that the plaintiffs' amended complaints failed to state a RICO claim because the defendants were not sufficiently distinct from the enterprise.

Section 1962(c) makes it unlawful "for any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c) (1988). In B.F. Hirsch v. Enright Refining Co., 751 F.2d 628, 633 (3d Cir.1984), we held that the defendant "person" charged with violating that statute cannot be the same entity as the alleged "enterprise." We observed that the statute, by its plain language, requires that the defendant be employed by or associated with an enterprise. The defendant Enright Refining Co. therefore could not simultaneously be both the defendant and the enterprise, because it would be illogi-

cal to say that a corporation was employed by or associated with itself. Id. at 633. We also observed that requiring the defendant and enterprise to be separate entities was consistent with the congressional purpose to punish criminals who infiltrate legitimate corporations, without punishing those corporations which may be the innocent victims of racketeering activity. Id. at 633–34.

We expanded the Enright rule in Brittingham v. Mobil Corp., 943 F.2d 297 (3d Cir. 1991). Plaintiffs accused Mobil Oil Corp. and its wholly owned subsidiary Mobil Chemical Co. of participating in an association-in-fact enterprise consisting of both corporations, their advertising agents, and other agencies which helped to fraudulently market trash bags in violation of section 1962(c). We affirmed a grant of summary judgment in favor of both corporations because the alleged enterprise was not sufficiently distinct from the defendants. Id. at 301, 303. We reasoned that Enright's requirement of distinctiveness would be eviscerated if a plaintiff could successfully plead that an enterprise consists of a defendant corporation associated with the employees, agents, and affiliated entities acting on its behalf. Id. When a RICO defendant is a collective entity, such as a corporation, it is likely that the alleged enterprise is an association of individuals or entities that constitute the defendant or carry out its actions. Id. at 302. Thus, we stated:

Without additional allegations, therefore, a subsidiary corporation cannot constitute the enterprise through which a defendant parent corporation conducts a racketeering enterprise. . . . [C]laims will be dismissed when the enterprise and defendant, although facially distinct, are in reality no different from each other.

Id. at 302–03. Relying on Petro–Tech, Inc. v. Western Co. of North America, 824 F.2d 1349, 1358–60 (3d Cir.1987), which upheld the dismissal of claims against a defendant corporation where its subsidiary was named alternatively as the enterprise, we concluded that the plaintiffs could not name Mobil Oil Corp. as the defendant and its subsidiary Mobil Chemical Co. as the enterprise. Brit-

*tingham,* 943 F.2d at 303. We affirmed the grant of summary judgment because the plaintiffs failed to produce evidence indicating that the defendant corporations, in contrast to individuals or entities acting on their behalf, took a distinct role in the alleged racketeering activity. *Id.*

We followed *Brittingham* in *Glessner v. Kenny,* 952 F.2d 702 (3d Cir.1991), in which a parent corporation was the defendant and its subsidiary the alleged enterprise. We upheld the dismissal under Rule 12(b)(6) of the plaintiff's section 1962(c) claim. Neither the complaint nor RICO case statement alleged any basis by which the parent corporation and its subsidiary were sufficiently distinct for purposes of stating a RICO claim. *Glessner,* 952 F.2d at 710–11.

■ After *Brittingham* and *Glessner,* it is still theoretically possible for a parent corporation to be the defendant and its subsidiary to be the enterprise under section 1962(c). However, the plaintiff must plead facts which, if assumed to be true, would clearly show that the parent corporation played a role in the racketeering activity which is distinct from the activities of its subsidiary. A RICO claim under section 1962(c) is not stated where the subsidiary merely acts on behalf of, or to the benefit of, its parent.

■ In the present case, the alleged enterprise is B & O. The defendants are CSX and its wholly owned subsidiary C & O. Defendant C & O owns 99.63% of B & O's shares. The amended complaints allege that CSX and C & O actively managed B & O and caused B & O to declare the dividend in a manner that defrauded its debentureholders. However, stating that the parent directed the subsidiary's fraudulent acts does not satisfy the distinctiveness requirement in *Brittingham.* Instead, it suggests that the subsidiary carried out the affairs of the parent.

Plaintiffs contend that CSX and C & O played an active role in perpetrating a fraud that was not played by B & O. Numerous allegations in the amended complaints, however, suggest that all three companies en-

gaged in concerted action. *See, e.g.,* App. at 347, 351, 360 (B & O and defendants fraudulently concealed material information); *id.* at 350 (Hochwarth Stipulation made on behalf of B & O, C & O, and Chessie Systems); *id.* at 350–51 (B & O and defendants failed to provide notice of opportunity to receive dividend); *id.* at 352–53 (B & O and defendants falsely misrepresented scope of Hochwarth Stipulation); *id.* at 355 (through press release in December 1986, plaintiff discovered that she was injured by B & O and defendants' fraudulent conduct); *id.* at 356 (B & O and defendants employed fraudulent or reckless scheme to deprive plaintiffs of the dividend, to deprive plaintiffs of the same relief as the *PTC/Guttmann* plaintiffs, and to conceal their violations of securities laws).[3] The alleged frauds which constitute the RICO predicate acts—e.g., nondisclosures of the MAC dividend, the letter agreements with Chase Manhattan Bank, the Hochwarth Stipulation, and the *PTC/Guttmann* litigation— are described as being committed by both the parent and subsidiary corporations. Thus, many of the pleaded facts undercut plaintiffs' theory that the corporate defendants are distinct from the enterprise consisting of their subsidiary.

Plaintiffs make the additional arguments to distinguish this case from *Brittingham.* They argue that in *Brittingham,* both the parent and subsidiary corporations were part of an association-in-fact enterprise under 18 U.S.C. § 1961(4), while in the present case, the alleged enterprise is not an association in fact and the defendants are not part of the enterprise. In *Brittingham,* however, we stated clearly that "this definition [of an enterprise as an association in fact] does not affect the separate inquiry into whether the alleged enterprise is distinct from the defendant." 943 F.2d at 300. Our holding in *Brittingham* did not depend upon whether the enterprise was an association in fact, but upon whether it was a distinct entity from the defendant.

■ Plaintiffs argue that the parent company in *Brittingham* passively benefitted

---

**3.** These allegations are taken from the *Savin* complaint, but the allegations in the *Lorenz* com-

plaint are substantially the same.

from its subsidiary's activities, while defendants CSX and C & O received a direct benefit (MAC stock) from B & O's fraudulent conduct and caused B & O's interests to decrease. A parent company normally can be expected to benefit from its subsidiary. For purposes of stating a section 1962(c) claim, it does not matter whether that benefit can be characterized as direct or indirect.[4]

Plaintiffs also argue that *Brittingham* involved a wholly-owned subsidiary, while B & O is not wholly owned. The mere fact that C & O owned 99.63% rather than 100% of B & O's stock does not make them distinct entities for purposes of stating a RICO claim. The decision in *Brittingham* did not hinge upon whether the subsidiary was wholly or partially owned. Indeed, we concluded that the enterprise could not include advertising agencies retained by the defendant corporations, though none of those agencies were even partially owned by defendants. The advertisers were agents of the defendant corporations who conducted the corporations' affairs. *Id.* at 303.

After reviewing the amended complaints and RICO case statement, we conclude that the plaintiffs have failed to allege sufficient facts to show that defendants CSX and C & O are distinct entities from the alleged enterprise consisting of their subsidiary B & O. The district court correctly dismissed the RICO claims.

## III. DENIAL OF MOTION TO AMEND

■ The district court denied plaintiff Savin's motion for leave to amend her amended complaint for the purpose of adding factual allegations to her RICO claim. We review the district court's decision for an abuse of discretion. *Bechtel v. Robinson*, 886 F.2d 644, 647 (3d Cir.1989).

■ Fed.R.Civ.P. 15(a) provides that "a party may amend [its] pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." The Supreme Court has identified several factors to be considered when applying Rule 15(a):

> If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be "freely given." Of course, the grant or denial of an opportunity to amend is within the discretion of the District Court, but outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely an abuse of that discretion and inconsistent with the spirit of the Federal Rules.

*Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962). We have

---

4. The plaintiffs rely on *Petro–Tech*, which involved a motion to dismiss. The plaintiff alleged that a defendant corporation participated in an association-in-fact enterprise consisting of itself and some of its employees. We reversed the dismissal of the claim, stating that "[b]ecause Western is alleged to have attempted to benefit from its employees' racketeering activity, it is appropriate to allow the victims of that activity to recover from Western." 824 F.2d at 1361. We have subsequently interpreted this language very narrowly as leaving open only the "theoretical possibility" that a corporation can take a separate, active role in RICO violations also committed by its employees, in which case the corporation is the active perpetrator rather than passive victim of racketeering activity. *Brittingham*, 943 F.2d at 302. This theoretical possibility, however, does not save the plaintiffs' RICO claim. As we explained, their allegations

are insufficient to establish that the defendants played an active role in the alleged racketeering activity distinct from that of the subsidiary. Furthermore, in both *Brittingham* and *Glessner*, we instead followed another portion of *Petro–Tech*, more relevant to the present case, which dismissed aiding and abetting and vicarious liability claims where the defendant corporation and its subsidiary were alternatively pled as the enterprise. *See Brittingham*, 943 F.2d at 302–03; *Glessner*, 952 F.2d at 710–11; *Petro–Tech*, 824 F.2d at 1358–60. Such claims were the practical equivalent of alleging that the defendant parent company was the "person" while its subsidiary was the "enterprise." Thus, *Petro–Tech* provides additional support for the principle that, except in extraordinary circumstances, a parent corporation cannot be the defendant and its subsidiary the enterprise under section 1962(c).

interpreted these factors to mean that "prejudice to the non-moving party is the touchstone for the denial of an amendment." *Cornell & Co. v. Occupational Safety & Health Review Comm'n*, 573 F.2d 820, 823 (3d Cir. 1978). In the absence of substantial or undue prejudice, denial instead must be based on bad faith or dilatory motives, truly undue or unexplained delay, repeated failures to cure the deficiency by amendments previously allowed, or futility of amendment. *Heyl & Patterson Int'l, Inc. v. F.D. Rich Housing of the Virgin Islands, Inc.*, 663 F.2d 419, 425 (3d Cir.1981), *cert. denied*, 455 U.S. 1018, 102 S.Ct. 1714, 72 L.Ed.2d 136 (1982).

■ In denying Savin's motion for leave to amend, the district court did not make any finding of prejudice, but instead based its decision on undue delay, previous failures to amend, and futility of amendment. The proposed amendment contains a long list of facts occurring in B & O's history from 1961 to 1987. They include: B & O's no-dividend policy from 1961 to 1978; B & O's purchase of debentures at less than face value from 1974–77; the transfer of non-rail assets to MAC and declaration of the dividend in December 1977; the *PTC/Guttmann* litigation and the remedies awarded; alleged misrepresentation of the scope of the Hochwarth Stipulation during the course of that litigation; transfer of MAC's assets to other CSX affiliates in 1983 to avoid participation in those assets by B & O minority security holders; the imposition of excessive costs on B & O in 1981–83 to defend civil and criminal anti-trust actions; and the attempted merger of B & O into C & O in 1986–87 to eliminate B & O's minority shareholders.

This proposed amendment was requested three years after the action was filed and nearly two years after the complaint was amended for the second time. Most of the facts were available to plaintiff Savin before she filed her original complaint in 1986, and probably all of them were available when she amended her complaint in May and August of 1987 and when she filed her RICO case statement in September of 1987. Over the three-year period between the filing of her original complaint and the filing of her motion to amend, Savin had numerous opportunities to correct any deficiencies in her RICO claim but failed to take advantage of them. Her delay was unreasonable.[5]

Furthermore, even if they were pled, these additional facts would not breathe life into her RICO claim. Most of them either are repetitions of events already described in the amended complaint, or they have little or no relevance to the defendants' defrauding the debentureholders out of the opportunity to receive the MAC dividend or participate in the *PTC/Guttmann* remedy. Because of Savin's unreasonable delay in requesting leave to amend, and because of the futility of her proposed amendment, we hold that the district court did not abuse its discretion in denying her Rule 15(a) motion.

## IV. BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING CLAIMS AGAINST DEFENDANT CHASE MANHATTAN BANK

The district court dismissed plaintiffs' claims against the indenture trustee Chase Manhattan Bank for breach of the implied covenant of good faith and fair dealing, allegedly arising from the bank's failure to inform them of the MAC dividend, the letter agreements with B & O, and the *PTC/Guttmann* judgment.[6] Because the indenture specifies that the liability of the trustee shall be determined under New York law, we will apply New York law.

---

5. Plaintiff argues that she should have been allowed to amend her complaint in light of *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239, 109 S.Ct. 2893, 2900, 106 L.Ed.2d 195 (1989), which held that a pattern of racketeering activity must satisfy the requirements of relationship and continuity. The deficiencies in plaintiff's RICO claim in no way involve the "pattern of racketeering" element. *H.J. Inc.* is inapposite.

6. Count V of the amended complaints specifically accuses the bank of breach of fiduciary duty. The bank contends that the plaintiffs failed to plead a breach of the implied covenant of good faith and fair dealing. In its opinion, the district court discussed both theories before it dismissed Count V. *Lorenz*, 736 F.Supp. at 655–57. We will assume that the plaintiffs attempted to plead a good faith and fair dealing claim and will now examine the sufficiency of that claim.

■ The courts of New York consistently have held that the duties of an indenture trustee, unlike those of a typical trustee, are defined exclusively by the terms of the indenture. *Green v. Title Guar. & Trust Co.*, 223 A.D. 12, 15, 227 N.Y.S. 252, 256 (1st Dep't), *aff'd*, 248 N.Y. 627, 162 N.E. 552 (1928); *Hazzard v. Chase Nat'l Bank*, 159 Misc. 57, 80–81, 83–84, 287 N.Y.S. 541, 566–67, 570 (Sup.Ct.N.Y. County 1936), *aff'd*, 257 A.D. 950, 14 N.Y.S.2d 147 (1st Dep't 1939), *aff'd*, 282 N.Y. 652, 26 N.E.2d 801, *cert. denied*, 311 U.S. 708, 61 S.Ct. 319, 85 L.Ed. 460 (1940); *AMBAC Indemnity Corp. v. Bankers Trust Co.*, 151 Misc.2d 334, 336, 338–39, 573 N.Y.S.2d 204, 206, 207 (Sup.Ct.N.Y. County 1991); *Elliott Associates v. J. Henry Schroder Bank & Trust Co.*, 838 F.2d 66, 71 (2d Cir.1988); *Meckel v. Continental Resources Co.*, 758 F.2d 811, 816 (2d Cir.1985). The sole exception to this rule is that the indenture trustee must avoid conflicts of interest with the debentureholders. *See United States Trust Co. v. First Nat'l Bank*, 57 A.D.2d 285, 295–96, 394 N.Y.S.2d 653, 660–61 (1st Dep't 1977), *aff'd*, 45 N.Y.2d 869, 410 N.Y.S.2d 580, 382 N.E.2d 1355 (1978); *Elliott Associates*, 838 F.2d at 71, 73.

■ The plaintiffs specifically claim that Chase Manhattan Bank violated the implied covenant of good faith and fair dealing which, under New York law, is contained in every contract. *Rowe v. Great Atl. & Pac. Tea Co.*, 46 N.Y.2d 62, 68, 412 N.Y.S.2d 827, 830, 385 N.E.2d 566, 569 (1978). The implied covenant prohibits either party from doing anything which would prevent the other party from receiving the fruits of the contract. *Kirke La Shelle Co. v. Paul Armstrong Co.*, 263 N.Y. 79, 87, 188 N.E. 163, 167 (1933). The covenant, however, cannot be used to insert new terms that were not bargained for. A covenant is implied only when it is consistent with the express terms of the contract. *Sabetay v. Sterling Drug, Inc.*, 69 N.Y.2d 329, 335, 514 N.Y.S.2d 209, 212, 506 N.E.2d 919, 922 (1987).

■ An indenture is, of course, a contract. Unless the indenture trustee has deprived the debentureholders of a right or benefit specifically provided to them in the indenture, there is no violation of the implied covenant of good faith and fair dealing. *See Broad v. Rockwell Int'l Corp.*, 642 F.2d 929, 957–58 (5th Cir.) (in banc) (applying New York law), *cert. denied*, 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981); *cf. Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.*, 716 F.Supp. 1504, 1517–22 (S.D.N.Y.1989) (no breach of implied covenant under New York law where corporation's incurrence of debt to fund leveraged buyout depleted the value of its debentures, as the indenture lacked any terms prohibiting the transaction). We therefore will consider whether the indenture in this case contains provisions which entitled the debentureholders to receive notice of the MAC dividend, the letter agreements with B & O, or any of the remedies in the *PTC/Guttmann* action.

■ The indenture contains no provisions which explicitly require the trustee to provide notice of any kind to the debentureholders. Plaintiffs cite two provisions which they claim implicitly require notice. First, the indenture states:

> The Indenture permits the amendment thereof and the modification or alteration, in any respect, of the rights and obligations of the Company and the rights of the holders of the Debentures ... at any time by the concurrent action of the Company and of the holders of 66⅔% in principal amount of the Debentures then outstanding affected by such amendment, modification or alteration (including, in the case of a modification of the terms of conversion of this Debenture into common stock of the Company or of payment of the principal of, or the premium or interest on, this Debenture, the consent of the holder hereof), all as more fully provided in the Indenture.

App. at 380–81. Plaintiffs claim that the letter agreements between B & O and Chase Manhattan Bank altered their rights under the Indenture. Those agreements provided that the debentureholders would be allowed to participate equally in any judgment against B & O or any settlement regardless of whether they converted their debentures to common stock. Because the quoted language gives the debentureholders the right to vote regarding any change in their or the

company's rights and obligations under the indenture, the plaintiffs argue that they were entitled to notice of the letter agreements.

Second, the indenture provides:

> At any meeting at which there shall be a quorum the holders of the Affected Debentures shall have the power by resolution adopted as hereinafter provided:
>
> (a) to authorize the Trustee to join with the Company in making any modification, alteration, repeal of or addition to any provision of this Indenture or of the Debentures, and any modification of or addition to the rights and obligations of the Company or the rights of the holders of the Debentures ... under this Indenture or under the Debentures....

App. at 440. The plaintiffs claim that the letter agreements between B & O and Chase Manhattan Bank were supplemental indentures which modified or added to their rights under the indenture. Because the debentureholders have the right to vote on whether to permit the indenture trustee and company to execute a supplemental indenture, the plaintiffs argue that they were entitled to notice.

Both provisions cited by plaintiffs provide debentureholders with the right to vote, and arguably therefore to receive notice, only if there is some modification of the debentureholders' rights or the company's obligations under the indenture. We agree with the district court that the letter agreements did not affect their rights under the indenture and cannot be characterized as supplemental indentures. The agreements pertained only to the scope of a possible remedy under the federal securities laws in the *PTC/Guttmann* litigation, in the event of a judgment against the defendant corporations or a settlement. The plaintiffs' contractual rights under the indenture itself, including rights regarding conversion of shares, were never modified.

It would have been advantageous for the plaintiffs to have been informed of the letter agreements and thus of potential violations of securities laws committed by B & O. They may have sued the defendant corporations years earlier. However, so long as an indenture trustee fulfills its obligations under the express terms of the indenture, it owes the debentureholders no additional, implicit duties or obligations, except to avoid conflicts of interest. *Elliott Associates,* 838 F.2d at 71. There is no provision in the indenture which obligated the trustee Chase Manhattan Bank to inform the debentureholders that they possibly had rights against B & O and its parent companies under the federal securities laws. Because the bank did not deprive the plaintiff of any right under the indenture, the bank could not have breached the implied covenant of good faith and fair dealing.

Plaintiffs rely heavily on *Van Gemert v. Boeing Co.,* 520 F.2d 1373 (2d Cir.) (*Van Gemert I*), *cert. denied,* 423 U.S. 947, 96 S.Ct. 364, 46 L.Ed.2d 282 (1975). In that case, debentures on their face required the company to provide notice before exercising its option to redeem them. The indenture provided that such notice could be by publication in a newspaper. The court concluded that because the debentures did not specify the kind of notice that would be provided, the debentureholders were entitled to expect reasonable notice of the redemption call. *Id.* at 1383–85. Though the company complied with the terms of the indenture by publishing notice in a newspaper, the court held that it failed to provide fair and reasonable notice to the debentureholders. *Id.* at 1383. In a subsequent opinion, the court stated that the defendant was liable because it violated the implied covenant of good faith and fair dealing. *Van Gemert v. Boeing Co.,* 553 F.2d 812, 815 (2d Cir.1977) (*Van Gemert II*).

*Van Gemert* indicates that when a debenture or indenture expressly requires notice, the implied covenant of good faith and fair dealing requires the defendant to provide notice which is reasonably calculated to enable the debentureholders to obtain the benefit of their contract. In the present case, however, the indenture does not have any provision which required the bank to provide notice regarding B & O's alleged violations of securities laws and the resulting litigation. To infer such a requirement would, in effect, add a new term to the indenture, and the implied covenant can never be used for that purpose. The district court correctly dis-

missed the claims against Chase Manhattan Bank for breach of the implied covenant of good faith and fair dealing.[7]

## V. BREACH OF FIDUCIARY DUTY CLAIMS AGAINST DEFENDANTS CSX AND C & O

Plaintiffs claim that defendants CSX and C & O, as controlling shareholders of B & O, breached a fiduciary duty to disclose material information. The district court concluded that the defendants owed no duties to the plaintiff debentureholders aside from those specified in the indenture. Finding no breach of the indenture, the district court dismissed the breach of fiduciary duty claims.

■ It is well-established that a corporation does not have a fiduciary relationship with its debt security holders, as with its shareholders. The relationship between a corporation and its debentureholders is contractual in nature. *See Broad*, 642 F.2d at 958–59 (applying New York law); *Metropolitan Sec. v. Occidental Petroleum Corp.*, 705 F.Supp. 134, 141 (S.D.N.Y.1989) (same); *Simons v. Cogan*, 549 A.2d 300, 303 (Del.1988); American Bar Foundation, *Commentaries on Indentures* 2–3 (1971). Just as an indenture trustee's duties are strictly defined by the indenture, *see, e.g., Hazzard*, 159 Misc. at 80–81, 287 N.Y.S. at 566–67, a corporation is under no duty to act for the benefit of its debentureholders, or to refrain from action which dilutes their interest, except as provided in the indenture. *Parkinson v. West End St. Ry. Co.*, 173 Mass. 446, 448, 53 N.E. 891, 892 (1899) (Holmes, J.); *Commentaries, su-*

*pra*, at 527. Even if the debentures are convertible, the debentureholder is merely a creditor who is owed no fiduciary duty until conversion takes place. *In re Will of Migel*, 71 Misc.2d 640, 642–43 336 N.Y.S.2d 376, 379 (Sur.Ct. Orange County 1972); *Simons*, 549 A.2d at 303–04.

■ As we stated in Part IV *supra* with respect to the indenture trustee's liability, the indenture contains no provisions which entitled the debentureholders to receive notice of the Hochwarth Stipulation, the letter agreements between B & O and Chase Manhattan Bank, or events in the *PTC/Guttmann* litigation. Plaintiffs have not identified, nor have we found, any additional provisions which impose upon B & O or its controlling shareholders a duty to disclose such information. The district court, therefore, correctly dismissed the breach of fiduciary duty claims.

## VI. SECTION 10(b) CLAIMS AGAINST DEFENDANTS CSX, C & O, AND B & O

Plaintiffs claim that the defendant corporations violated section 10(b) and Rule 10b–5 of the '34 Act by failing to disclose material information to the debentureholders. The district court dismissed these claims as untimely under the applicable statute of limitations.

In *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, —— U.S. ——, ——, 111 S.Ct. 2773, 2782, 115 L.Ed.2d 321 (1991), the Supreme Court held that the statute of limitations under section 10(b) and Rule 10b–5 is

---

7. Plaintiffs also rely on *Brass v. American Film Technologies, Inc.*, 987 F.2d 142 (2d Cir.1993), in which the defendant corporation sold warrants without informing the purchaser that the underlying shares were restricted. The court held that the purchaser stated a claim for fraudulent concealment based on New York's "superior knowledge" rule. *Id.* at 151–52. Under that rule, a party to a contract is under a duty to speak when he possesses superior knowledge not readily available to the other party, and knows that the other party is acting on the basis of mistaken knowledge. *Id.* at 150.

The plaintiffs claim that Chase Manhattan Bank was under a duty to disclose the MAC dividend, the letter agreements, and the *PTC/Guttmann* litigation because of its superior

knowledge of these events affecting the value of the debentures. We disagree. The plaintiffs have not alleged that the bank possessed superior knowledge, or that they acted upon mistaken knowledge, at the time they purchased their debentures prior to December of 1977. In other words, there is no claim of fraudulent concealment in the making of the contract. Instead, the plaintiffs invoke the "superior knowledge" doctrine as a source of a duty to disclose events occurring months or years later. As we stated above, the indenture trustee's duties are defined by the terms of the indenture. The bank complied with those terms and therefore cannot be held liable, even if had greater knowledge than the debentureholders.

one year after discovery of the fraud and within three years after such violation. By statute, the limitation period for any civil action commenced on or before June 19, 1991, the day before the issuance of the *Lampf* opinion, is determined by the law of the appropriate jurisdiction as it existed on that date. 15 U.S.C. § 78aa–1(a) (Supp. III 1991). The present actions were filed in 1986 and 1987. We therefore must apply pre-*Lampf* Third Circuit law.

In *In re Data Access Systems Securities Litigation*, 843 F.2d 1537, 1550 (3d Cir.) (in banc), *cert. denied*, 488 U.S. 849, 109 S.Ct. 131, 102 L.Ed.2d 103 (1988), we held that the statute of limitations for a violation of section 10(b) and Rule 10b–5 is one year after the plaintiff discovers the violation and in no event more than three years after the violation. This limitations period (which is the same as *Lampf*) applied retroactively. *Hill v. Equitable Trust Co.*, 851 F.2d 691, 692 (3d Cir.1988), *cert. denied*, 488 U.S. 1008, 109 S.Ct. 791, 102 L.Ed.2d 782 (1989).

In *PTC II*, we held that the defendants committed fraud on December 13, 1977 in violation of Rule 10b–17 by failing to provide the debentureholders with advance notice of the MAC dividend. 680 F.2d at 941–42; *id.* at 945–46 (Garth, J., concurring in part and concurring in the judgment). The question now is whether the defendants may have committed fraud after December 13, 1977.

 The plaintiffs' securities fraud claims are based on the defendant corporations' alleged failure to disclose material information to the debentureholders regarding the MAC dividend, Hochwarth Stipulation, and *PTC/Guttmann* litigation, prior to the publication of notice in December of 1986. When an allegation of fraud under section 10(b) is based upon a nondisclosure, there can be no fraud absent a duty to speak. *Chiarella v. United States*, 445 U.S. 222, 235, 100 S.Ct. 1108, 1118, 63 L.Ed.2d 348 (1980).

 We held in Part V *supra* that the defendants committed no breach of fiduciary

under state law because they were under no duty to speak. The corporations complied with the terms of the indenture and did nothing to injure the plaintiffs' rights thereunder. Where a corporation, by virtue of its compliance with the terms of an indenture, cannot be held liable under state law for fraud or breach of contract against its debentureholders, federal courts have refused to find any fraud in violation of section 10(b) or Rule 10b–5. *See Broad*, 642 F.2d at 963; *Meckel*, 758 F.2d at 814, 815–16; *Metropolitan Sec.*, 705 F.Supp. at 141. A corporation's obligations toward its debentureholders are defined by the terms of the indenture, and section 10(b) imposes no additional duties. Thus, the only fraud committed by the defendants which is actionable under section 10(b) is their failure to disclose the MAC dividend in December of 1977.

Under *Data Access Systems*, the maximum possible limitations period is three years. This time limit cannot be tolled. The plaintiffs' claims under section 10(b) and Rule 10b–5 therefore expired no later than December of 1980. Because the plaintiffs did not file their complaints until 1986 and 1987, the district court properly dismissed their section 10(b) and Rule 10b–5 claims as untimely.[8]

## VII. CONCLUSION

For the reasons stated, we will affirm the orders of the district court granting defendants' motions to dismiss.

---

**8.** Plaintiff Savin's action was transferred under 28 U.S.C. § 1407 from the Southern District of New York to the Western District of Pennsylvania. She contends that her claims are governed by the Second Circuit's pre-*Lampf* statute of limitations, which allegedly is six years. Even if we applied a six-year time limit, her section 10(b) claim would have expired in December of 1983, more than two years before she filed her complaint.